FILED

02/01/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 15, 2018

**STATE OF TENNESSEE v. ELVIS LOUIS MARSH**

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-68      Franklin L. Russell, Judge**

_____

**No. M2017-02360-CCA-R3-CD**

_____

The Defendant, Elvis Louis Marsh, was convicted of the sale of less than 0.5 grams of methamphetamine, delivery of less than 0.5 grams of methamphetamine, conspiracy to sell or deliver less than 0.5 grams of methamphetamine, possession of 0.5 grams or more of methamphetamine with the intent to sell or deliver, and possession of drug paraphernalia. He received an effective sentence of thirty years. On appeal, the Defendant argues that the evidence presented at trial is insufficient to support his convictions. Upon reviewing the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jonathan C. Brown, Fayetteville, Tennessee, for the appellant, Elvis Louis Marsh.

Herbert H. Slatery III, Attorney General and Reporter; Garrett Ward, Assistant Attorney General; Robert J. Carter, District Attorney General; and Andrew L. Wright and William B. Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

The Defendant's convictions were the result of a controlled drug transaction and a subsequent search which uncovered drugs and drug paraphernalia. The Seventeenth Judicial District Drug Task Force ("Task Force") utilized a confidential informant, Ms.

Tara Rowe, to arrange a controlled buy from the co-defendant, Ms. Crystal Alexander. Ms. Rowe contacted Lieutenant Timothy Miller, then Assistant Director of the Task Force, and informed him that she believed she could purchase methamphetamine from Ms. Alexander. On September 30, 2015, Ms. Rowe sent a series of text messages to Ms. Alexander and made arrangements to purchase crystal methamphetamine. They agreed that Ms. Rowe would go to Ms. Alexander's house to pick up the methamphetamine that afternoon. Detective Jose Ramirez, an investigator for the Task Force, drove Ms. Rowe to Ms. Alexander's house that day. Detective Ramirez posed as Ms. Rowe's "sugar daddy." This transaction was the first time that Detective Ramirez worked with Ms. Rowe. Detective Ramirez placed a recording device on Ms. Rowe prior to her entering Ms. Alexander's house. The recording device could not transmit the recordings instantaneously.

Detective Ramirez waited in the car while Ms. Rowe was inside Ms. Alexander's house. While Ms. Rowe was in the house, Detective Ramirez was in contact with other members of the Task Force, including Lieutenant Miller and Director Timothy Lane.

Ms. Rowe testified that upon entering Ms. Alexander's house, she saw the Defendant sitting on the couch in the living room with methamphetamine and scales on the couch beside him. Ms. Alexander, her father, and four children were also at the house. Ms. Rowe testified that the transaction took place between her and the Defendant in the living room. Ms. Rowe said she paid the Defendant one hundred dollars, using bills with recorded serial numbers. She testified that the Defendant weighed the methamphetamine on the scales during the transaction and that she retrieved it from the couch.

At trial, the State played a recording of the transaction. On the recording, Ms. Rowe talked to the Defendant, Ms. Alexander, and Ms. Alexander's father. Ms. Rowe and Ms. Alexander discussed selling a couch at the beginning of the transaction. Ms. Rowe talked about someone having their own scales there. Ms. Rowe and one of the males on the tape, either the Defendant or Ms. Alexander's father, discussed trying to find "nerve pills." Ms. Alexander told Ms. Rowe that she "put another bag around it because the other bag is real thin and you don't want to lose it." Ms. Rowe then engaged in small talk about selling a sound system. Ms. Rowe told the Defendant that she had access to other drugs that she could pick up from the pharmacy that afternoon and that if he was interested, Ms. Alexander had her number and he could call her. As Ms. Rowe was leaving she asked, "Are we good?" and the Defendant replied "yeah."

After the transaction was completed, Ms. Rowe immediately got back into Detective Ramirez's car, where she gave him a clear plastic bag that contained the methamphetamine she had just purchased. After they drove to a predetermined meeting

location, Detective Ramirez weighed the methamphetamine, which weighed less than the one gram that Ms. Rowe thought she had purchased. At the direction of the drug task force agents, Ms. Rowe called Ms. Alexander's cell phone to let her know that the methamphetamine was less than a gram. The State played recordings of three phone calls made by Ms. Rowe to Ms. Alexander's cell phone. The Defendant answered the cell phone each time. During the first call, Ms. Rowe told the Defendant that she weighed the drugs on her scales and that it only weighed 0.6 grams. She told him that he should check his scales. Conversation during the second call was again focused on the Defendant needing to check his scales because Ms. Rowe did not receive a full gram of drugs. During the final call, Ms. Rowe and the Defendant again discussed the scales, and Ms. Rowe said that she "deals with" Ms. Alexander and not with him. At 3:08 p.m., Ms. Rowe sent a text message to Ms. Alexander's cell phone stating "[I']m stoned now." Ms. Rowe reiterated that she wished to conduct future transactions with Ms. Alexander in a text message sent at 3:11 p.m. which stated, "And id rather deal with her not u cuz u always trying to get over on me."

On cross-examination, trial counsel spent a great deal of time impeaching Ms. Rowe's ability to recollect information as well as her character for truthfulness. Ms. Rowe admitted she did not remember things "because I do a lot of drugs." She testified that she had seizures and bipolar disorder and overdosed twice in 2017. She said that at no point was she patted down by a female officer prior to or after making the controlled buy. Each member of the Task Force who testified agreed that on the day of the controlled buy, Ms. Rowe was lucid and did not appear to be under the influence of any narcotics or alcohol.

The members of the Task Force who testified each described the protocol used in controlled buys. Detective Ramirez testified that he prerecorded the bills by taking a photograph of the serial numbers on each bill and that he searched Ms. Rowe both before and after she entered Ms. Alexander's house. He admitted that he did not do a cavity search of Ms. Rowe before or after the controlled buy and that there were no female officers present to conduct the cavity search.

After the controlled buy, Lieutenant Miller applied for a search warrant. The Task Force returned to Ms. Alexander's house several hours later with the search warrant. The Defendant, Ms. Alexander, Ms. Alexander's father, and four children were present when the house was searched. Lieutenant Miller testified that Ms. Alexander was in the master bedroom during the search. The Task Force found 1.18 grams of methamphetamine, $807 in cash, pipes used to smoke methamphetamine, a small amount of marijuana, and unknown crushed pills in two Crown Royal bags in the master bedroom. Four of the prerecorded $20 bills used by Ms. Rowe in the earlier transaction were found on the bed,

and one was found on the floor of the bedroom. The only contraband found outside the master bedroom was a set of electronic scales found on the couch in the living room.

Lieutenant Miller testified that after the search, he spoke with the Defendant and Ms. Alexander about where they purchased the methamphetamine. According to Lieutenant Miller, the Defendant and Ms. Alexander would meet a man named Jeff to purchase approximately three-and-a-half grams of methamphetamine multiple times a week. Lieutenant Miller claimed that both the Defendant and Ms. Alexander "admitted that they had about five or 10 regular customers that came to them. That Crystal sold to some of them, and Elvis sold to some of them[.]" Director Lane testified that in Ms. Alexander's statement she stated that "on the majority of the sales, that Elvis would be the person that would actually make the sale happen."

Special Agent Cassandra Franklin-Beavers with the Tennessee Bureau of Investigation ("TBI") testified that the substances seized from Ms. Alexander's house tested positive for methamphetamine. She testified that the methamphetamine purchased by Ms. Rowe weighed 0.34 grams and that the methamphetamine found in Ms. Alexander's master bedroom weighed 1.18 grams.

Ms. Alexander testified on behalf of the Defendant. The Defendant is the father of Ms. Alexander's two children. She said the Defendant would come to her house three times a week to care for their children while she was at work. Ms. Alexander testified that on September 30, 2015, Ms. Rowe came to her house to purchase methamphetamine. The transaction took place in Ms. Alexander's living room. She claimed that after Ms. Rowe paid the Defendant, he gave Ms. Alexander the money. Ms. Alexander then placed the money into a Crown Royal bag.

When officers returned a few hours later, Ms. Alexander was in her bedroom. She testified that the methamphetamine, marijuana, money, and pipes found during the search of the bedroom belonged to her. After law enforcement searched Ms. Alexander's house, she gave a statement to the officers. She admitted to law enforcement that she and the Defendant sold methamphetamine together approximately ten times per week. On cross-examination, Ms. Alexander admitted that the Defendant had been in the master bedroom earlier that day.

The jury found the Defendant guilty of the sale of less than 0.5 grams of methamphetamine, delivery of less than 0.5 grams of methamphetamine, conspiracy to sell or deliver less than 0.5 grams of methamphetamine; possession of 0.5 grams or more of methamphetamine with the intent to sell or deliver; and possession of drug paraphernalia. The trial court merged the sale, delivery, and conspiracy convictions and imposed an effective sentence of thirty years to be served in confinement. The Defendant

filed a motion for a new trial arguing that the evidence presented at trial was insufficient to sustain each of his convictions. The trial court denied the motion, finding that, "[t]he evidence was not only sufficient, but frankly pretty overwhelming, when taken as a whole." This appeal follows.

## ANALYSIS

The Defendant maintains that the evidence presented at trial was insufficient to support each of his convictions. Specifically, he asserts that his presence at Ms. Alexander's house during the transaction and the search is insufficient to establish that he participated in the transaction with Ms. Rowe or that he possessed any of the drugs and paraphernalia found during the search.

The standard for appellate review in determining the sufficiency of the evidence is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have the essential elements of the crime beyond a reasonable doubt.'" *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A defendant "must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt" in order to obtain relief on a claim for insufficient evidence. *State v. Perrier*, 536 S.W.3d 388, 408 (Tenn. 2017). Further, because a jury conviction removes a defendant's presumption of innocence and "replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted defendant," who must demonstrate that the evidence is insufficient support the jury's verdict. *Id.*

A conviction can be supported exclusively by circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "'Circumstantial evidence … is intrinsically no different from testimonial evidence.'" *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). Whether the evidence is direct or circumstantial, "'a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous interference.'" *Id.* (quoting *Holland*, 348 U.S. at 140). The jury determines the weight given to circumstantial evidence. *Id.* (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).

This court "will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we reweigh or re-evaluate the evidence." *Perrier*, 536 S.W.3d at 408 (citing *Dorantes*, 331 S.W.3d at 379). "'The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).

## A. Sale and Delivery of a Controlled Substance

The jury convicted the Defendant for the sale and delivery of less than 0.5 grams of methamphetamine, a Schedule II controlled substance, for selling Ms. Rowe 0.34 grams of methamphetamine in violation of Tennessee Code Annotated section 39-17-417(a). Tennessee Code Annotated section 39-17-417 states: "(a) It is an offense for a defendant to knowingly: (1) Manufacture a controlled substance; (2) Deliver a controlled substance; (3) Sell a controlled substance; or (4) Possess a controlled substance with the intent to manufacture, deliver or sell the controlled substance." Methamphetamine is a Schedule II controlled substance. T.C.A. § 39-17-408. A sale occurs when there is a bargained-for offer and acceptance and an actual or constructive transfer or delivery of the controlled substance. *See State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). Delivery of a controlled substance occurs when there is either an actual, constructive, or attempted transfer from one person to another of a controlled substance. T.C.A. § 39-17-402(6). It is a Class C felony to deliver or sell less than 0.5 grams of a Schedule II controlled substance. *See* T.C.A. 39-17-417(c)(2)(A).

The Defendant argues that the State failed to meet its burden and relies on Ms. Rowe's testimony that she picked up the methamphetamine off of the couch herself. The evidence presented at trial established that Ms. Rowe and the Defendant engaged in a transaction where she paid him one hundred dollars in exchange for methamphetamine. Although the Defendant argues on appeal that Ms. Rowe's testimony is not credible, her testimony and determinations of her credibility are issues to be considered by the jury. *See State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014) (concluding that the trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight given to evidence). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 SW.3d 289, 297 (Tenn. 2012). Based on the evidence presented at trial, we conclude that there was adequate evidence to prove that the Defendant engaged in a sale of methamphetamine with Ms. Rowe and that he delivered the methamphetamine to her.

## B. Conspiracy to Sell a Controlled Substance

The Defendant maintains that the evidence was insufficient to support his conviction of conspiracy to sell methamphetamine. As it relates to this case, Tennessee Code Annotated section 39-12-103 provides:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating

commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

….

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

A conspiracy can be shown by a "'mutual implied understanding'" between the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993) (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)). The State is not required to prove that the parties had an official agreement, and the agreement may be established by circumstantial evidence. *Id.* "Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense." *State v. William Henry Smith, Jr.*, No. M2016-01475-CCA-R3-CD, 2017 WL 127863, at *6 (Tenn. Crim. App. Jan. 13, 2017) (citing *Shropshire*, 874 S.W.2d at 641).

The Defendant argues that he was merely present at Ms. Alexander's house when the transaction occurred. He points out that Ms. Rowe sent text messages to Ms. Alexander's cell phone and did not communicate with him about the transaction prior to its occurrence. The State responds by arguing that Ms. Alexander stated to law enforcement that she would arrange the sales, but the Defendant would ordinarily handle the actual transaction and that this is sufficient to show a conspiracy existed. There is an abundance of evidence establishing that the Defendant was engaged in a conspiracy with Ms. Alexander to sell methamphetamine to Ms. Rowe. This evidence includes the recorded phone calls between the Defendant and Ms. Rowe during which the Defendant and Ms. Rowe discussed the weight of the methamphetamine that she just purchased from him, Ms. Rowe's testimony that he weighed the methamphetamine, and Ms. Alexander's statement to police that she and the Defendant often sold methamphetamine at least ten times a week.

The jury could reasonably find that the Defendant satisfied the overt act requirement when he weighed the methamphetamine, received the money, and gave the money to Ms. Alexander. In this case, the evidence viewed in a light most favorable to the State establishes that the Defendant conspired with Ms. Alexander to sell Ms. Rowe methamphetamine.

### C. Possession of Schedule II Controlled Substance and Drug Paraphernalia

In order to prove possession of a controlled substance, the State was required to prove at trial that the Defendant knowingly "[p]ossess[ed] a controlled substance with the intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4). On appeal, the Defendant argues that he did not have actual or constructive possession of the methamphetamine found during the Task Force's search of Ms. Alexander's house, and, thus, there was not sufficient evidence to support his conviction. Specifically, the Defendant asserts that "his mere association and presence in the co-defendant's living room was not adequate proof that he had knowledge of the contraband in the co-defendant's master bedroom or that he participated in any arranged drug buy between the co-defendant and the Confidential Informant." *See State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1991) ("[M]ere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.").

A conviction for possession of a controlled substance may be based on either actual or constructive possession. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). However, before a defendant can be found to constructively possess contraband, it must appear that he had the "power and intention at any given time to exercise dominion and control over the drugs either directly or through others." *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000).

The evidence presented at trial established that the Defendant was not merely present in Ms. Alexander's house. Although the methamphetamine weighing over 0.5 grams was found in Ms. Alexander's bedroom, the Defendant had access to the bedroom, and Ms. Alexander acknowledged that the Defendant had been in her bedroom on the day of the offenses. Further, the jury could infer that the Defendant had the ability to exercise control over the contraband found in Ms. Alexander's bedroom based on the transaction with Ms. Rowe that took place mere hours earlier in which he had possession of the methamphetamine, placed an amount of it onto his scales, weighed it, and accepted Ms. Rowe's money in exchange for it. Although Ms. Alexander testified that the methamphetamine found in the bedroom belonged to her and not the Defendant, the jury is not obligated to accept her testimony. However, Ms. Alexander also gave a statement that she and the Defendant regularly participated in drug transactions. The jury is "'the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.'" *State v. Matthew Reynolds*, No. M2017-00169-CCA-R3-CD, 2018 WL 6253829, at *7 (Tenn. Crim. App. Nov. 28, 2018) (quoting *Bolin v. State*, 405 S.W. 768, 771 (Tenn. 1966)). Accordingly, the evidence was sufficient to show that the Defendant had constructive possession of the methamphetamine located in the bedroom.

We also conclude that the evidence presented at trial was sufficient to support the Defendant's conviction for possession of drug paraphernalia. The State was required to prove that: (1) the Defendant possessed an object; (2) that object was classified as drug paraphernalia; and (3) that the Defendant intended to use that object for an illicit purpose. T.C.A. § 39-17-425(a)(1); *see also State v. Ross*, 49 S.W.3d 833, 846 (Tenn. 2001). Here, the evidence presented at trial showed that the Defendant had constructive possession of the scales in the living room and the pipes found in the bedroom. The testimony from both Ms. Alexander and Ms. Rowe confirmed that the Defendant had control over the scales. He used the scales to weigh the methamphetamine that he sold to Ms. Rowe. The Defendant also had constructive possession of the pipes found in the bedroom for the same reasons articulated above. The scales were being used for an illicit purpose, weighing methamphetamine prior to selling it. Accordingly, we conclude that the evidence presented at trial was sufficient to support all of the Defendant's convictions.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE